UNITED STATES DISTRICT COURT

                         DISTRICT OF CONNECTICUT


        ---------------------------x

        KENNETH W. JONES, ET AL
                        Plaintiff,           3:08CV802 (RNC)

                   vs.

        MIDLAND FUNDING, LLC, ET AL          May 28, 2009
                        Defendant
        ---------------------------x

                                        Federal Building
                                        450 Main Street
                                        Hartford, Connecticut


                            HEARING ON MOTIONS




        Held Before:
             The Honorable Donna F. Martinez
                U.S.D.C. Magistrate Judge







                    FALZARANO COURT REPORTERS
                     117 North Saddle Ridge
                    West Simsbury, CT 06092
                        860.651.0258

```
 1        APPEARANCES:

 2            For the Plaintiffs:

 3                LAW OFFICES OF JOANNE FAULKNER
                  123 Avon Street
 4                New Haven, CT 06511-2422
                  203.772.0395
 5                    By:  JOANNE S. FAULKNER, ESQ.

 6            For the Defendants:

 7                WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
                  3 Gannett Drive
 8                White Plains, NY 10604-3407
                  914.323.7000
 9                    By:  THOMAS A. LEGHORN, ESQ.

10                WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
                  1010 Washington Boulevard
11                Stamford, CT 06901
                  203.388.9101
12                    By:  STEPHEN P. BROWN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (Commenced:  1:07 p.m.)

 2

 3           THE COURT:  All right; this is Jones vs.

 4      Midland Funding, Et Al, 3:08CV802, assigned

 5      to Chief Judge Chatigny.  May we have your

 6      appearances for the record.

 7           MS. FAULKNER:  Joanne Faulkner for

 8      Plaintiff Jones.

 9           MR. LEGHORN:  Thomas Leghorn of Wilson,

10      Elser for the defendants with --

11           MR. BROWN:  Stephen Brown of also Wilson

12      Elser for the defendant, your Honor.

13           THE COURT:  Welcome.  Let me tell you a

14      little bit about the schedule, before we get

15      further into this.  I will, of course, go

16      through all of the pending motions and hear

17      both sides thoroughly on that.  I do have a

18      -- I, actually, have two criminal matters.

19           One criminal matter is sort of a

20      leftover from this morning.  One of the

21      lawyers got called to another courtroom.

22      When I see those -- and I've got the family

23      milling about in the hallway.  When I see

24      that the lawyers are ready to resume, I'm

25      going to break from this case and I'll take
```

```
 1              that case.  That shouldn't take me too long.

 2              And then at 2:30 I have another criminal

 3              matter scheduled.  I'm not really sure when

 4              that will be ready to go forward.  I just

 5              want to give you a heads-up that it's out

 6              there.  And depending on how we do in your

 7              case, you might get interrupted for that.

 8                   So, we have three motions to be argued

 9              this afternoon.  We have number 27, the

10              plaintiff's motion to compel; number 30, the

11              plaintiff's second motion to compel regarding

12              supplementary discovery; and number 55, the

13              plaintiff's motion to compel the production

14              of documents and deposition appearance.

15                   So why don't I do this:  I'll hear the

16              plaintiff and the defendant.  If you want to

17              make any broad statements in the nature of an

18              opening statement to give me some sort of

19              context, but my intention would be to go one

20              by one through the requests that are in

21              dispute.

22                   All right?  Do you want to make a

23              statement, Ms. Faulkner?

24                   MS. FAULKNER:  Just briefly, your Honor.

25                   THE COURT:  All right.
```

```
 1              MS. FAULKNER:  I'm sure that you know
 2         that this is a punitive class action, and it
 3         is under the Fair Debt Collection Practices
 4         Act.  And we are here on discovery issues
 5         where we're trying to get certain information
 6         from the defendants about the allegations of
 7         the complaint and the defenses.
 8              THE COURT:  All right.  Anything
 9         Mr. Brown or Mr. Leghorn?
10              MR. LEGHORN:  I think it would probably
11         be more effective to go item by item.
12              THE COURT:  All right.
13              MR. LEGHORN:  But there is one other
14         fully briefed motion that I think was
15         referred to.
16              THE COURT:  I know that.  I do know
17         that.  But the only motions I'm going to take
18         today are 27, 30 and 55.
19              MR. LEGHORN:  No problem.
20              THE COURT:  All right.  I'm starting, of
21         course, with the first motion to compel,
22         number 27, and I'm ready to go item by item.
23         We'll begin with interrogatory number two,
24         the total number of Connecticut debtors.
25              MS. FAULKNER:  Yes, that is probably
```

```
 1              moot, your Honor.  I don't think we have a

 2              formal answer to that, but they have provided

 3              us with information that is more than 18,000

 4              people.  And if they haven't changed their

 5              mind, I believe that's moot.

 6                   MR. LEGHORN:  We haven't changed our

 7              mind.

 8                   THE COURT:  All right.  So should I mark

 9              it, Ms. Faulkner, withdrawn or denied as

10              moot; do you have a preference?

11                   MS. FAULKNER:  I don't have any

12              preference, Judge.

13                   THE COURT:  All right.  It'll be marked

14              withdrawn without prejudice, interrogatory

15              number two.

16                   MS. FAULKNER:  Interrogatory number

17              three, we have an agreement that identifies

18              each person in the state of Connecticut need

19              not be responded until class is certified, if

20              ever.  So that that may be granted if a class

21              is certified.

22                   THE COURT:  Do you agree with that?

23                   MR. LEGHORN:  I think withdrawn without

24              prejudice would probably be better because

25              we're going to give them the class list.
```

```
 1              THE COURT:  All right.  Why don't we
 2         mark it withdrawn without prejudice and, you
 3         know, depending on how the class
 4         certification works out, one would think you
 5         might be able to work this through.  If you
 6         can't, then, of course, you can file another
 7         motion and come back and the Court will
 8         decide it.
 9              So withdrawn without any prejudice.  I
10         don't mean to say that you can't litigate it
11         further, that you're withdrawing the
12         underlying request.
13              MS. FAULKNER:  Could it be renewed
14         easily, your Honor?  I'd hate to have to go
15         through another whole --
16              THE COURT:  I think we can do that.
17              All right; interrogatory number four, a
18         detailed explanation of the plaintiff's debt.
19              MS. FAULKNER:  Yes, interrogatories four
20         and five, and productions 8, 13, 15 and 22
21         are all interrelated because they all address
22         the issues of whether interest was added, how
23         much interest was added; the two things which
24         are at the heart of the substantive issues in
25         this case.
```

1              We asked for the policies and

2         procedures for adding interest.  We asked for

3         training materials with regard to adding

4         interest.  And just before I filed this in

5         November, the defendants agreed to revisit

6         the responses as to whether there are any

7         policies or procedures regarding the

8         additional interest.

9              We also asked for policies and

10        procedures regarding the addition of other

11        charges, which we also alleged in the

12        complaint, but they did not -- they refused

13        to go back and look at any policies with

14        regard to other charges.

15             THE COURT:  All right; Counsel?

16             MR. LEGHORN:  Your Honor, the objection

17        to this is that these requests do not bear

18        upon any allegation within the complaint.

19        The complaint deals with the claim that

20        between this series of three letters that

21        went to Ms. Faulkner's client that the amount

22        increased without language that plaintiff

23        argues should have been in there to make it

24        compliant with the FDCPA.

25             There are no allegations that there

1          were any improper charges, incorrect

2          computation of interest.  There was nothing

3          to do with that.  There's no dispute as to

4          the debt.  This is all totally irrelevant to

5          the very limited legal issue that's presented

6          by this complaint.  And it is not something

7          that is easily -- if forced to do it, it

8          isn't that you could go to a manual and take

9          one page out.

10               It would be a very time consuming job

11          to check throughout the company to see what

12          everything is in for all the different

13          accounts and whatever.  So this is a very

14          burdensome request that does not pertain to

15          any issue that's in this case.

16          THE COURT:  All right; what about the

17          relevance argument?

18          MS. FAULKNER:  We allege that between

19          the letters, interest or other charges were

20          added.  They denied it.

21          MR. LEGHORN:  We don't deny that

22          interest was added.  The allegation is that

23          the amount increased between letter to

24          letter, which we've admitted.  There is no

25          claim that there's any violation of the FDCPA

```
 1          because of what was added, but rather of our

 2          supposed failure to advise the plaintiff that

 3          the number could go up or that he could call

 4          to get an up-to-date figure on it.

 5               There's nothing to do with the

 6          components of it, just the fact that it did

 7          go up.

 8               THE COURT:  All right.  How would the

 9          plaintiff use, as defense counsel says, it's

10          a component, how is that relevant to the

11          question of whether the disclosures were

12          adequate?

13               MS. FAULKNER:  We said that they -- we

14          alleged that they added interest or other

15          charges.  We do not know.  They said, We'll

16          look up our policies as to adding interest.

17          We will not look up our policies as to adding

18          other charges.

19               THE COURT:  So your adversary says it

20          really doesn't matter what we added.  We

21          added something, and the whole question here

22          is whether we properly informed the plaintiff

23          of it.

24               MS. FAULKNER:  We don't know whether

25          they properly informed the plaintiff, without
```

1    knowing what they were supposed to inform the

2    plaintiff of.  We know that the amount

3    increased between the letters.  We suspect

4    it's interest and other charges.  We don't know.

5        THE COURT:  All right.

6        MR. LEGHORN:  But I come back to the

7    same point, your Honor.  There is no claim at

8    this point or has there been that there was

9    anything added to the account that was

10    improper or impermissible.  And this is on an

11    account that the plaintiff had and has access

12    to their own prior account statements to see

13    what the rate of interest was that was

14    accruing on it.

15        I just see it going in another

16    direction that has taken us away from the

17    focus of this plaintiff's complaint.  It's

18    one of the reasons why we made the request of

19    the judge to brief the motion for summary

20    judgment, because we think the underlying

21    claim itself is without merit that would

22    collapse the whole house of cards on this.

23        THE COURT:  All right.  I understand

24    that argument.

25        Anybody want to be heard further on the

1      manuals, training manuals?  It seems to me

2      that's a different argument than the

3      computation.

4          MS. FAULKNER:  I think we restricted all

5      this to the interest, the manuals for adding

6      interest, the procedures for adding interest

7      or other charges.  So, I'm not looking for a

8      whole --

9          THE COURT:  Training manual.

10          MR. LEGHORN:  Right.  And that's

11      accurate because we purposely did not raise

12      any bona fide error defense under the

13      statute, which would normally call that into

14      play.

15          THE COURT:  So is the defendant's only

16      objection relevance?

17          MR. LEGHORN:  Well, relevance and the

18      burdensomeness of that request, yes.

19          THE COURT:  So the only two objections

20      are relevance and burdensomeness; is that

21      right?  Counsel?

22          MR. LEGHORN:  Yes, your Honor.

23          THE COURT:  All right.  All other

24      objections are abandoned?

25          MS. FAULKNER:  There was no objection as

```
 1              to burdensomeness in the original answers,

 2              your Honor.

 3                   MR. LEGHORN:  Well, the general

 4              objections were added in -- was not

 5              reasonably calculated to lead to the

 6              discovery of admissible evidence.

 7                   THE COURT:  Well, that's a relevance

 8              argument.

 9                   MR. LEGHORN:  I'm not aware that we

10              raised all the defenses, your Honor.  We

11              certainly aren't intending to abandon

12              anything we've raised, but I think that's

13              what we raised.

14                   THE COURT:  Well, that's what I want to

15              know, counsel.  In your papers, work product,

16              attorney-client, confidential, proprietary,

17              but I'm not hearing any argument.

18                   MR. LEGHORN:  I guess these were all

19              lumped together.  You're right, your Honor.

20              In terms of how -- this industry in which

21              debts are purchased and then collected by not

22              the original creditor, it's a business with

23              very thin margins and it's a very competitive

24              business.  And that information, if it was

25              disclosed, would be harmful to our clients in
```

```
 1            the -- to the extent that the competitors
 2            would see what they're doing, would be able
 3            to undercut them on that.
 4                 And in connection with some of the
 5            policies and procedures that could be swept
 6            up in these broad requests, there would be
 7            advice of counsel.  They work closely with
 8            their in-house compliance counsel to make
 9            sure everything is onboard.  So, that's where
10            those objections came from, your Honor.
11                 THE COURT:  Anything else?
12                 MR. LEGHORN:  And this gets back to the
13            final -- the motion which won't be heard, in
14            terms of the confidentiality.
15                 These companies are also part of a
16            publicly-traded company, Encore Capital, and
17            there would be concerns that some of the
18            financial information would be an
19            impermissible disclosure of not publicly
20            available financial information, contrary to
21            the SEC rules.
22                 THE COURT:  So, the objections I'm
23            hearing are relevance, burdensomeness, and
24            that the information sought is proprietary.
25                 MR. LEGHORN:  And potentially privileged
```

1        as well.

2             THE COURT:  Well, potentially privileged?

3             MR. LEGHORN:  In terms of the extent

4        they would be calling upon advices from their

5        compliance counsel.  For purposes of what

6        we're here to decide, your Honor, I don't

7        think that that would be the overriding one.

8        I think that --

9             THE COURT:  Doesn't work that way,

10       counsel.  You can't just throw all your

11       objections into a bucket and hope to preserve

12       them.  This is the time to make argument.

13            MR. LEGHORN:  I understand, your Honor.

14       And with a limited purpose of these, we'll

15       stand on the ones other than privilege.

16            THE COURT:  Relevance, burdensomeness,

17       and then it seeks proprietary or trade secret

18       information.

19            MR. LEGHORN:  Correct, your Honor.

20            THE COURT:  All right.  I think that

21       brings us to request for production number

22       thirteen, documents related to defendant's

23       activities to collect debts such as this one.

24            MS. FAULKNER:  Again, that goes to -- we

25       have limited that to interest and other

1   charges, your Honor, as you see in my memo.

2       MR. LEGHORN:  Yes, your Honor, I think

3   counsel has combined interrogatories four and

4   five and production request, 8, 13, 15, and

5   22.  Both of our comments were directed to

6   all of those.

7       THE COURT:  Well, how is the request for

8   documents relating to activities to collect

9   debts such as this one, relevant?  And how is

10  it the same argument as how the interest and

11  fees are calculated?

12      MS. FAULKNER:  In the course of our

13  discussions, we limited this to documents

14  relating to activities to collect debts,

15  which included interest and other charges.

16      THE COURT:  How is that relevant to the

17  plaintiff's claim?

18      MS. FAULKNER:  This is a class action.

19  It goes to the pattern of practice and the

20  fact that they were also imposing this same

21  added interest or charges, as they did with

22  the plaintiff to the other class members.

23      THE COURT:  So, what does the plaintiff

24  mean when the plaintiff says all of the

25  defendant's activities?

```
1              MS. FAULKNER:  Documents related to.
2         It's kind of the same thing.  You have
3         documents showing that you are going to add
4         interest to these accounts, that you are
5         going to add charges to these accounts.
6              THE COURT:  So documents which show the
7         efforts or calculation or something of that
8         sort?
9              MS. FAULKNER:  Policies.
10             THE COURT:  So it's nothing more than
11        that?  The plaintiff doesn't seek anything
12        more than that?  It's not anything of a
13        different variety or character?
14             MS. FAULKNER:  That's correct, your
15        Honor.
16             THE COURT:  Is that the way you
17        understand it as well?
18             MR. LEGHORN:  That's the way
19        Ms. Faulkner explained it to me, yes.
20        Because if it was beyond that, we would argue
21        it would have absolutely no relevance, and it
22        would be going to the bona fide error
23        defense, which we did not raise.
24             THE COURT:  All right.  Fifteen,
25        documents regarding policy and training
```

```
 1              manuals, again is the same?

 2                   MS. FAULKNER:  That's correct, your

 3              Honor.

 4                   THE COURT:  Twenty-two?

 5                   MS. FAULKNER:  The same again.  All

 6              related to the adding interest and other

 7              charges.

 8                   THE COURT:  All right.  I think that

 9              brings us to interrogatory nine.

10                   MS. FAULKNER:  Nine, we are asking for

11              other litigation, other similar litigation

12              for the purpose of showing that they had

13              notice of this claim prior to our lawsuit.

14                   THE COURT:  So when you say "other

15              similar litigation" what do you mean?

16                   MS. FAULKNER:  Similar to that being

17              asserted by the plaintiffs in the instant

18              matter, which is the addition of interest or

19              other charges.

20                   THE COURT:  Okay.

21                   MR. LEGHORN:  And I believe our response

22              was -- we responded that we are not aware of

23              any similar lawsuits.

24                   THE COURT:  And you're pressing it,

25              Ms. Faulkner, in view of that response?
```

```
 1              MS. FAULKNER:  Well, I'm looking at --
 2       am I looking at the wrong thing?  The
 3       defendants objects to interrogatory number
 4       nine, as it is overly broad, unduly
 5       burdensome, not narrowly tailored to lead to
 6       the discovery of admissible evidence
 7       additionally as readily obtainable by
 8       plaintiff, therefore, the defendants should
 9       not bear the burden of disclosure?
10          THE COURT:  The defendants suggest that
11       although they maintain that objection, they
12       actually answered the interrogatory.  I, of
13       course, don't know whether they answered or
14       didn't answer it.
15          MS. FAULKNER:  I just read you their
16       entire answer, your Honor.
17          MR. LEGHORN:  I thought we had sent that
18       along afterwards, but I'm more than happy to
19       provide Ms. Faulkner with a response that we
20       are unaware of any similar lawsuits.
21          THE COURT:  All right.  Interrogatory
22       nine will be granted.
23           Interrogatory number thirteen.
24          MS. FAULKNER:  Thirteen and fourteen are
25       related, set forth the date on which the
```

Falzarano Court Reporters

1    format of each letter was put into use and

2    identify each person involved in the drafting

3    of the content of the letters attached to the

4    complaint. And production twenty-one asked

5    for similar information.

6         In November, when I filed this, they

7    had agreed to investigate whether there were

8    archives showing the year when the form

9    letters were put into use and the dates of

10   any changes, and I have gotten no

11   supplemental response to that.  Now, that

12   goes, of course, to the length of the class

13   period:  How far back it goes; how far

14   forward it goes.

15        MR. LEGHORN:  We have provided the

16   templates for each of the letters.  As well

17   as the testimony that's now been provided at

18   the deposition gave counsel the complete

19   mechanics of how these documents are created,

20   and how it is, in essence, a document, that

21   is, when it's updated, the template continues

22   on.  So all the information that is available

23   to us has already been provided either

24   through the templates or through sworn

25   deposition testimony on the point.

1           So, this one has already been fully

2      responded to, to the fullest extent possible

3      by the defendants.

4           THE COURT:  One of the questions is to

5      identify each person involved in the

6      drafting.

7           MR. LEGHORN:  And that was revealed in

8      the deposition testimony as well.  The who

9      was the original creator of the original form

10     way back when there was no record of.  But

11     the departments, the people involved at this

12     point, and through the relevant period of

13     time, were identified at the deposition.

14     There's no further information to give.

15          THE COURT:  Let me make sure I

16     understand.  So, what I'm hearing you say is

17     we might have raised an objection at one

18     point.  We don't raise it anymore.  We've

19     answered, and the answer is adequate.  Is

20     that what I'm hearing or it's something else?

21          MR. LEGHORN:  Well, we did object, but

22     for the sake of expedience, we provided the

23     deposition testimony.  So, yes, those

24     objections were waived for the purposes of

25     allowing the deposition to go forward.

```
 1              THE COURT:  All right.
 2              MS. FAULKNER:  Your Honor, they have not
 3         yet, either at the deposition or here, set
 4         forth for thirteen, the date on which each
 5         format of the letter was put into use.  And
 6         they have not identified the persons, as they
 7         did in their response.  They identified the
 8         department, but not the persons involved or
 9         the roles of each person.
10              In other words, somebody may have
11         drafted it; somebody may have approved it;
12         somebody may have said, you've got to change
13         this.  We don't know whether it was the legal
14         department or -- I think in the deposition
15         they said it was their advertising or
16         marketing department who did this.  I'm not
17         sure.
18              THE COURT:  How is the identity of the
19         person who drafted the letter relevant to the
20         ultimate claim?
21              MS. FAULKNER:  Well, we would have taken
22         his or her deposition while we were out in
23         California, if we'd known who to ask for.
24              THE COURT:  But how would it be
25         relevant?  What does it get you to?
```

1              MS. FAULKNER:  It gets us to what

2      charges were being added; whether they knew

3      what charges were being added.  Perhaps the

4      drafter of the letter didn't know what

5      charges were being added or that charges were

6      being added.  We don't know.

7              MR. LEGHORN:  Well, your Honor, we've

8      given all the information we have.  At this

9      point, in order to provide further

10      information, would not reveal anything

11      further to the plaintiffs.

12              To go to the level of detail that

13      counsel now wants with respect to this, even

14      if it existed, would go to defeating a bona

15      fide error defense, as to our practices,

16      procedures in coming up with this.  Were we

17      cognizant of, you know, the FDCPA, and what

18      was done and what wasn't.  So that does go --

19      so that would bring back into relevance.  To

20      the extent that we've given the information,

21      we've waived the objections as to what we've

22      given.  To the extent that even if further

23      information existed, that we would maintain

24      our objection to.  But it's really moot,

25      because we've given it all already.  We do

1          not have the names of the individual who did

2          the specific drafting.

3               THE COURT:  So that would be the answer

4          to the interrogatory, wouldn't it?

5               MR. LEGHORN:  Right, which we've done

6          through the deposition already, your Honor,

7          and that's under oath from Brian Frary, who

8          is in the general counsel office.

9               MS. FAULKNER:  This information, of

10         course, is not relevant only to the bona fide

11         error defense, but it is relevant to the

12         damages.  Because in either a class or

13         individual action we have to discuss the

14         frequency and persistence of the

15         noncompliance, the nature of the

16         noncompliance, and the extent to which the

17         debt collector's noncompliance was

18         intentional.  So, those are factors in the

19         damages aspect of the case, not only in the

20         bona fide error defense aspect.

21              THE COURT:  All right; I understand the

22         argument.  We're now at interrogatory

23         fifteen.  And I can't tell from the papers

24         whether there's been an agreement on fifteen.

25         One of you says it's resolved, the other one

 1          doesn't address it.

 2               MS. FAULKNER:  It has not been resolved.

 3               THE COURT:  All right.

 4               MS. FAULKNER:  Fifteen and sixteen, in

 5          their initial response, the defendants

 6          asserted that plaintiff had brought the

 7          action for purposes of harassment, so that

 8          they could get an award under 1692k.

 9               We pointed out to them that all but, I

10          guess, one of the cases involved, says that

11          this is not an affirmative defense.  It is a

12          motion at the end of the case.

13               So, they agreed to withdraw the defense

14          on condition that they had the right to do a

15          motion at the end of the complaint.  So as

16          far as we are aware, they still intend to do

17          a motion to seek fees and costs if plaintiff

18          loses the case.  And they would base it on

19          our failure to conduct a good faith inquiry,

20          and our bringing the action without

21          substantial justification.  So that's why

22          we're asking for the facts and the law which

23          would support their intent motion.

24               THE COURT:  All right; I understand that

25          argument.

1           MR. LEGHORN:  And this goes purely to,

2      as we've put forth, the opinions and legal

3      theories of counsel and of in-house counsel

4      in terms of the total absence of merit of

5      this case, the fact that there is no case on

6      point supporting a plaintiff's position.  And

7      having brought that to the attention of

8      counsel at the outset, it's our good faith

9      belief of it to keep things in order we did,

10     we have reserved that for the end.  But at

11     this point, it's not asserted as affirmative

12     defense.  But it is preserved, if at the end

13     of the matter is before -- but all this does

14     is probe the mental impressions of both

15     in-house and external counsel.

16          THE COURT:  So it's work product?

17          MR. LEGHORN:  Work product.

18          THE COURT:  Anybody have anything else

19     to say?  I understand the plaintiff's

20     argument as to why the plaintiff seeks it.  I

21     understand the defense's that it's work

22     product.  Anybody want to amplify those

23     arguments in any way?

24          MR. LEGHORN:  No, your Honor.

25          MS. FAULKNER:  It's standard.  We ask

```
 1              for the facts, first of all, if there are any

 2              facts.  That certainly is not work product.

 3              And we ask for the law applicable to the

 4              facts, which is certainly not work product.

 5              I believe Rule 33 allows you to ask for the

 6              applicability of the law to the facts.

 7                   They have already told us orally that

 8              they couldn't find any case law either way.

 9              I would like to have that in writing.

10                   MR. LEGHORN:  Well, plaintiffs can't

11              have it both ways.  They can't ask us to keep

12              it out of the case until the end, but want it

13              through discovery at this point.  And

14              although at the beginning of this case there

15              wasn't law one way or the other, but the

16              Seventh Circuit, in Wall vs. Midland, clearly

17              has pronounced, in our view, a determination

18              of this issue.

19                   THE COURT:  All right.  I think we are

20              at request for production number twenty-one;

21              documents surveying the number of letters

22              sent and related communications.

23                   MR. LEGHORN:  Your Honor, that was done

24              with interrogatories thirteen and fourteen, I

25              believe.
```

```
 1              MS. FAULKNER:  Well, no, it does appear
 2         to be different, because we're getting at the
 3         number of letters substantially similar that
 4         were sent.  Again, this goes to the
 5         intentional nature, frequency, and
 6         persistence of noncompliance.  And it is
 7         limited, again, to the interest and other
 8         charges that may have been added.
 9              MR. LEGHORN:  And we have produced a
10         template for the three letters, but
11         substantially similar is a very vague term.
12         These are all collection letters.  It is
13         ill-defined.  It would, if read in it's
14         broadest sense, it could encompass any
15         collection letter that this company has ever
16         sent.  That clearly cannot be the import of
17         what plaintiffs are seeking, if it is going
18         to have any relevance to the case.  And if
19         that is what plaintiffs are seeking, then it
20         would be incredibly burdensome and difficult
21         to do.
22              We have given the full extent of the
23         letters that the templates that dealt with
24         and slight variations of the three letters in
25         question.  And so, we have given the very
```

1       similar letters, but we have not given all

2       collection letters.  We've given the ones

3       that match up to this.  The library of these

4       letters would be quite exhaustive through the

5       period of time this company has been in

6       existence.

7            So, it's relevance, it's burdensome,

8       and it's a big and ambiguous request.

9            THE COURT:  All right; is the plaintiff

10      seeking every collection letter that the

11      company ever sent?

12           MS. FAULKNER:  No, your Honor.

13           THE COURT:  The thrust of the objection

14      seems to be the phrase "substantially

15      similar" is too vague.

16           MS. FAULKNER:  Substantially similar to

17      the letters attached to the complaint.  There

18      were three letters attached to the complaint,

19      all of which had form numbers on them.  And

20      generally speaking, the way they keep their

21      records -- I don't know about Midland, but I

22      know about a lot of other companies -- you

23      can tell how many Letter L03 went out.  Your

24      printer gives you that information.  100,000

25      of them, 50 of them; you can tell.

```
 1              THE COURT:  I don't think he's quibbling

 2          with you about the number.  I think he's

 3          quibbling with you because he says he doesn't

 4          know what substantially similar means.  He's

 5          afraid if it's granted he won't give you

 6          everything or he went be able to tell what

 7          he's required to give you.

 8              MS. FAULKNER:  I think when we discussed

 9          this, we said you can use the number of the

10          letters.  Each letter has a number ID or

11          combination, letter number ID, and I think we

12          said you could use that.

13              THE COURT:  So each of the collection

14          letters that's attached to the complaint has

15          an identifying number?

16              MS. FAULKNER:  Right.

17              THE COURT:  And the plaintiff wants to

18          know how many letters with those identifying

19          numbers were sent?

20              MS. FAULKNER:  Right.  And their

21          evaluation.  Sometimes collection agencies

22          evaluate how effective letters are.  And if

23          leaving out the disclosures that the interest

24          will be added is more effective than putting

25          it in that will go into their calculation.
```

```
 1              THE COURT:  Okay.  Let me make sure I

 2        understand.  What I'm hearing the plaintiff

 3        say is that what the plaintiff seeks in

 4        request for production number twenty-one is

 5        the number of letters with the same

 6        identifying numbers or code or whatever it is

 7        attached to the complaint, and any

 8        evaluations that resulted from the use of

 9        those letters?

10           MS. FAULKNER:  And instructions relating

11        to the use of those letters.

12           THE COURT:  So that's your definition of

13        substantially similar, it seems; am I right

14        Ms. Faulkner?

15           MS. FAULKNER:  Yes, your Honor.

16           THE COURT:  Okay.

17           MR. LEGHORN:  Then I've complied with

18        the production element because Ms. Faulkner

19        has the templates and those letters.  And

20        also, as to the number, that is the number

21        where we started off with, saying that we've

22        said pending class certification that the

23        number is already in excess of 18,000 or

24        something.  That's already been provided to

25        the plaintiff.
```

1              As to the component of that, as to the

2       evaluation of the letter, and that we

3       strenuously object to that, your Honor,

4       because, one, that has absolutely nothing to

5       do with whether the wording of this document

6       is violative of the FDCPA.  And clearly, that

7       would be -- put Midland at a tremendous

8       competitive disadvantage because that is

9       their business strategy, their rationale for

10      using one letter over another.  It has

11      nothing to do with this case.  And it would

12      be proprietary and harmful for its release.

13          THE COURT:  So how are evaluations

14      relevant to the plaintiff's claim?

15          MS. FAULKNER:  This goes to the damages

16      again, your Honor.  Whether the violation was

17      intentional, frequent, persistent.

18          THE COURT:  How would the evaluations

19      tell you that?  By evaluations you mean, as I

20      understand it, how successful these

21      collection letters were?

22          MS. FAULKNER:  Right.  I suspect their

23      marketing department has evaluated letters

24      that do disclose whether interest will be

25      added and letters that do not disclose, and

1    deciding which one is more effective as far

2    as getting the consumer to pay.

3        THE COURT:  How does that go to damages?

4        MS. FAULKNER:  Again, we have to show

5    the nature of the violation, the frequency

6    and persistence of noncompliance, the nature

7    of the noncompliance, the number of persons

8    adversely affected, and the extent to which

9    the debt collectors' noncompliance was

10   intentional.

11       THE COURT:  But how would the

12   evaluations show that?

13       MS. FAULKNER:  We expect that it would

14   show that they purposely used this letter

15   because they thought it would get more money

16   out of the consumer.

17       THE COURT:  All right.

18       MR. LEGHORN:  Well, I don't think

19   getting money out of a consumer that owes

20   money is a violation of FDCPA.  So if that's

21   the stated purpose, then it will fail on that

22   ground.

23       But we have provided letters.  We've

24   given testimony as to the period of times

25   that they've been in use.  That seems to be

```
 1              what counsel needs, if this letter is proved

 2              to be a violation.  As to the evaluation that

 3              she now seeks, I stand on the objection that

 4              I do not think it goes anywhere to

 5              establishing the claims or the issue of

 6              damages, and it would be burdensome and

 7              reveal proprietary information.

 8                   MS. FAULKNER:  I just would like to

 9              comment on all this throwing around of the

10              words "proprietary information".  There is no

11              substantiation of that, other than

12              Mr. Leghorn saying so.

13                   MR. LEGHORN:  The deposition transcripts

14              that have been submitted to your Honor in

15              connection with the other motion clearly

16              demonstrates the proprietary nature.

17                   THE COURT:  You want to just submit the

18              whole deposition transcript, have me read it,

19              and understand why it might be proprietary?

20                   MR. LEGHORN:  Well, I think Mr. Frary

21              brought forward that and explained that whole

22              situation.

23                   THE COURT:  Did you point it out in your

24              briefing?

25                   MR. LEGHORN:  Well, these motions
```

```
 1              preceded those depositions by a substantial

 2              number of months.  So, it was not in our

 3              briefing.

 4                   THE COURT:  All right.  Let me just take

 5              a moment because I see criminal counsel in

 6              the back of the courtroom.

 7

 8                   (Short recess was taken.)

 9

10                   THE COURT:  All right.  I believe now

11              that we are at request for production number

12              five, documents concerning purchase or

13              securitization of the plaintiff's FCNB

14              account, the original debt.  There's also

15              some suggestion in the papers that that's

16              been resolved.

17                   MS. FAULKNER:  I don't believe so, your

18              Honor.

19                   THE COURT:  All right.

20                   MS. FAULKNER:  They have provided us

21              with part of a document relating to the

22              agreement to buy the debt.  They have

23              provided an Exhibit B and an Exhibit D to

24              something else.  And whatever "something

25              else" is and whatever Exhibit A is and
```

1          whatever Exhibit C is, we do not have.

2              We also asked for this in production

3          twenty-seven and there was no objection to

4          that.  So it seems to me that we should get

5          it.

6              THE COURT:  I think in request for

7          production number twenty-seven, the

8          defendant's referred back to request for

9          production number five and incorporated those

10         objections.

11             MR. LEGHORN:  That's correct, your

12         Honor.

13             THE COURT:  Yes, I see that.  So the

14         objections are that it's broad, vague,

15         ambiguous, confidential, proprietary,

16         irrelevant.  And then the defendants also say

17         that they already forwarded the documents to

18         the plaintiff.

19             MR. LEGHORN:  What we forwarded to the

20         plaintiff was that portion of the agreement

21         which showed that the plaintiff's account was

22         part of this particular purchase, that

23         Midland was the true party in interest

24         collecting upon it.  Beyond that, there's

25         been no showing by the plaintiff of why any

```
 1            of this information would be relevant.  It is
 2            certainly of the highest confidential
 3            business nature, in terms of what Midland was
 4            able to negotiate in terms of a purchase rate
 5            from the original creditor for this portfolio
 6            debt.  And it's not relevant to any issue in
 7            the case other than establishing that Midland
 8            was the correct party to be pursuing the debt
 9            in the first place.
10                 THE COURT:  All right.
11                 MS. FAULKNER:  First of all, I have
12            gotten this type of thing in other litigation
13            from Midland, the whole agreement, not just
14            Exhibit B and Exhibit D, but agreements,
15            Exhibit A, Exhibit B, Exhibit C and Exhibit D.
16                 Midland Funding claims it does nothing,
17            on the one hand.  And on the other hand, they
18            claim that they bought this debt.  We want to
19            know what it is.
20                 I have seen agreements where they
21            actually buy the debt for one second and then
22            factor it out to somebody who is financing
23            the paper, financing the purchase of the
24            paper.
25                 So, one of our fallback positions is
```

1          that Midland really doesn't own this debt or

2          if it does and is collecting on it, it is

3          liable.  I don't know which is the case at

4          this point.

5               MR. LEGHORN:  And that's pure

6          speculation.  With the deposition of the

7          assistant controller in this matter, he's

8          testified that there is no securitization of

9          these debts.  So, that suspicion has already

10         been debunked.

11               But that whole line of suspicion does

12         nothing to the claim before the Court as to

13         whether the letters, the series of letters

14         were a violation by not telling them the

15         number would go up from time to time.

16               What we have shown is that Midland was

17         the proper plaintiff.  And if there was any

18         issue with him being pursued on this debt, it

19         was never raised before bringing a federal

20         lawsuit.  But that's to the side.  It is

21         totally irrelevant, and it seeks totally

22         confidential and proprietary business

23         information.

24               THE COURT:  So, Ms. Faulkner points out

25         that there's been no showing to support the

```
 1            objection that it's proprietary or trade
 2            secret.  The defendants made no showing of
 3            that.
 4                 You've simply said, My gosh, everybody
 5            knows that this is what we do.  It's our
 6            trade secret.
 7                 MR. LEGHORN:  Ms. Faulkner is not
 8            unfamiliar with our company and the parties
 9            that I represent.  The depositions were taken
10            here, those statements were made by the
11            individuals at the depositions.
12                 The information that has been given so
13            far answers to questions it shows that the
14            debt was owned by, you know, by Midland
15            Funding.  All of the other suspicions for
16            which the documents are sought are not part
17            of this case, are irrelevant.  And that's why
18            a further showing wasn't deemed to be
19            necessary at that time.
20                 But if that's what Your Honor would
21            wish, I'd ask the opportunity to submit
22            further affidavit from Mr. Frary laying out
23            why this is of a very delicate business
24            matter for them.
25                 THE COURT:  How is this relevant?  What
```

1       exactly are you going to use the information

2       for?

3               MS. FAULKNER:  One of the problems is we

4       don't know until we see it.  But I do believe

5       that Midland Funding did not purchase this

6       debt.  I believe they might have owned it for

7       an instance and that they -- somebody else,

8       an investor, they call it an investor,

9       probably owns the debt or owned it during

10      this time frame.

11              Securitization, if I may repeat the

12      testimony at the deposition:  They said we

13      haven't done securitization since the 1990s.

14              This is not true because I have a 2000,

15      somewhere in the 2000, agreement -- I have

16      the whole document, it doesn't relate to this

17      purchase -- which does show that the purchase

18      is funded or financed by an investor.

19              In addition, the agreement I have shows

20      that -- it contemplates that Midland Funding

21      will pretend it owns the debt and allow

22      Midland Credit to collect on it.  Those are

23      the express words of one of the documents I

24      have.

25              MR. LEGHORN:  Your Honor, all I can say

Falzarano Court Reporters

```
 1              is those allegations have never been raised.

 2              And if the Court wishes to consider them, I

 3              certainly would like the opportunity to have

 4              my client respond to that factually and under

 5              oath, because we can completely refute that.

 6              And it has never been raised in the case or

 7              in this motion.

 8                   Is it time for a break, your Honor?

 9                   THE COURT:  It is time for our break.  I

10              see counsel assembled in the courtroom.

11                   What I would suggest, counsel in the

12              civil case, is push your papers aside, and

13              we'll have criminal counsel come up.  We'll

14              have the defendant brought into the

15              courtroom.  We're in recess.

16

17                   (Recess:  1:56 p.m. to 3:10 p.m.)

18

19                   THE COURT:  All right.  Here we are

20              again.  Give me just a moment.

21

22                   (Pause.)

23

24                   THE COURT:  All right; for the record,

25              this is Jones vs. Midland, 08CV802.  We were
```

```
 1            in the midst of oral argument on several

 2            motions to compel.  And we are about to

 3            reserve that -- resume that oral argument.

 4                I think we're at request for production

 5            number twenty-seven on document twenty-seven,

 6            all documents relating to agreements between

 7            defendants and First Consumers National Bank.

 8                MS. FAULKNER:  I believe the same

 9            argument would prevail as to document number

10            twenty-seven.  Here the defendant is stating

11            that Midland has done nothing.  But I think,

12            at the very least, they have claimed to have

13            purchased and owned the account and sent it

14            out for collection.

15                So, again, we're trying to figure out

16            whether they did purchase or own the account,

17            and what the purchase documents might have

18            said about interest being added, authority to

19            collect, and so forth.

20                MR. LEGHORN:  And these are the same

21            arguments we discussed right before we took

22            the break, your Honor, in terms of Midland

23            has produced the documents which shows it is

24            the proper party and interest for pursuing

25            the debt, and any information between
```

1    Consumers National Bank and Midland is

2    totally irrelevant to the case at hand, your

3    Honor.

4         THE COURT:  Request for production

5    number seven; retainer servicing collection

6    agreements.  It seems to be the same request;

7    is it?

8         MS. FAULKNER:  No, it isn't.

9         THE COURT:  All right.

10         MS. FAULKNER:  This is a request between

11    Midland Funding and Midland Credit, servicing

12    agreement between the two defendants.  They

13    agreed to provide it if we would enter a

14    confidentiality agreement, but this is the

15    type of the document that has been repeatedly

16    held as not confidential.  We have gotten it

17    in other litigation without confidentiality.

18         MR. LEGHORN:  Well, not through me, your

19    Honor.  In any case I've represented Midland,

20    I've always produced this under a very strict

21    confidentiality order.  The information in

22    this document has no relevance to the outside

23    world, other than for the purpose of this

24    litigation.  And the sole purpose in this

25    case is to show the relationship between

1          Midland Funding, the owner of the debt and

2          Midland Credit who was servicing the debt.

3               Our offer has stood from Day One that

4          we would provide it under a confidentiality

5          order, and plaintiffs have offered no reason

6          for not providing, not agreeing to a

7          confidentiality order.

8               This is the business, work between the

9          two entities laid out here in this agreement.

10          It's a servicing agreement by which --

11               THE COURT:  So, I need more between this

12          is the agreement.  I know it's the agreement

13          because that's what is asked for.

14               MR. LEGHORN:  It's the financial

15          relationship between the two entities, and

16          how the money is collected and apportioned;

17          all of the financial information is contained

18          in here is how it will be collected; the

19          methodology by which the servicing company is

20          permitted to collect the debt; its

21          methodology of how it goes about collecting

22          debts.  Clearly, its business model is laid

23          out in this document, your Honor.  And it

24          would be injurious to them to have it out

25          there broadly broadcasted to the entire

```
 1            community.  It would be revealing their

 2            collection strategy for all to see.

 3                 THE COURT:  Anything plaintiff wants to

 4            say?

 5                 MS. FAULKNER:  I've seen one like it

 6            already.  It is not confidential.  It's just

 7            a typical business agreement.  Typical

 8            business agreements are not confidential.

 9            There's been no submission of any

10            documentation that it should be confidential

11            and I don't believe there can be.

12                 MR. LEGHORN:  I would just say, your

13            Honor, this offer was made to plaintiffs at

14            the outset, and other than just a blank

15            refusal to submit to any confidentiality

16            agreement, has never been put forth.  If

17            their basis is now we have not established it

18            sufficiently, I would ask for the opportunity

19            to submit the appropriate affidavits for

20            further buttressing, but I don't think it's

21            necessary, your Honor.

22                 THE COURT:  Production request number

23            sixteen; organizational chart for the

24            defendant.

25                 MS. FAULKNER:  I believe that was
```

```
 1              submitted at the deposition, but it was

 2              submitted under confidentiality imposed by

 3              the defendants.  We don't believe that

 4              document should be confidential.  It's just

 5              an organizational chart.  So we would like it

 6              produced without confidentiality.

 7                   MR. LEGHORN:  I think that's part of the

 8              motion to lift confidentiality, isn't it,

 9              Ms. Faulkner?

10                   THE COURT:  Talk to me.

11                   MR. LEGHORN:  I believe it's part of the

12              motion that we're not addressing today.  But

13              it was produced in connection with the

14              deposition.  It was produced under the

15              condition that it be kept confidential.  And

16              the reason it was produced under

17              confidentiality is that this is not a

18              publicly available document.  It encompasses

19              Encore Capital, which is a publicly-traded

20              document.  And this document is not available

21              to the shareholders of Encore or anyone else.

22                   So, therefore, the SEC rules would

23              preclude our publishing this document without

24              making it available to the shareholders as

25              well.  And there was no objection to that
```

1          document being produced under confidentiality

2          at the time it was agreed to at the deposition.

3               There was the proviso, vis-a-vie, the

4          testimony, that they would be free to test

5          the confidentiality of any provision or

6          portions of the testimony, but I do not

7          recall there being any comments said as to

8          document that there was any way that that was

9          in any way qualified or conditional.

10              THE COURT:  So, who bears the burden on

11         this?  I hear from the defendant that the

12         plaintiff hasn't -- that the plaintiff hasn't

13         given any good reason why the plaintiffs

14         refused to agree to confidentiality.  I hear

15         the plaintiff saying the defendant hasn't

16         made any showing that confidentiality is in

17         order.  Whose burden is it?

18              MR. LEGHORN:  The burden would be upon

19         me in the first instance to establish

20         confidentiality, and we set forth why,

21         because this is not a publicly available

22         document.  And the burden shifts now to the

23         plaintiff because in the manner in which it

24         was produced, it was an agreement that this

25         would be kept confidential and used only with

1        respect to this litigation.  There wasn't a

2        saving clause to say, I'm free to change my

3        mind on this.  There were no restrictions

4        placed on that.  So now I would say the

5        burden shifts to the plaintiff to establish

6        why, for what good reason, other than for the

7        use of this litigation, should that agreement

8        be altered.

9             THE COURT:  And under what authority is

10       the burden as you say it is?

11            MR. LEGHORN:  That its shifted to the

12       plaintiff?

13            THE COURT:  Yes.

14            MR. LEGHORN:  Because we've agreed to

15       it.

16            THE COURT:  So the authority for all of

17       this is the agreement between the parties?

18            MR. LEGHORN:  Well, at this stage, yes,

19       your Honor.  Initially, it was -- the reason

20       we asserted confidentiality is trying to be

21       in strict compliance with the SEC rules in

22       terms of what the company is allowed to

23       release but it's not otherwise publicly

24       available.

25            And the penalties for release of such

```
 1              information are quite severe, in the tens of

 2              thousands of dollars for the individuals and

 3              up to a million dollars for the entity

 4              itself.

 5                   THE COURT:  And are you telling me that

 6              all of this is set forth in the other pending

 7              motion?

 8                   MR. LEGHORN:  Yes, your Honor, as to the

 9              testimony, but not as to the document.

10              Because I'm not sure if the document was

11              something that they tried to challenge.  I

12              thought it was just the testimony.

13                   THE COURT:  Well, none of this argument

14              that you're advancing before the Court orally

15              is in the papers.  You're telling me some of

16              it is in the other pending motion, and I'm

17              trying to understand.

18                   MR. LEGHORN:  The argument as to why

19              information such as would be compassed within

20              the document, such as the SEC rules, is

21              encompassed within the other pending motion.

22              Those arguments, I know, were raised in

23              connection with testimony.  I cannot recall

24              and I do not believe that they challenged the

25              assertion of confidentiality as to these
```

1          documents, this one document.

2               THE COURT:  All right.

3               MS. FAULKNER:  We have challenged the

4          confidentiality of this document from the

5          beginning.  We started out asking for it.

6          They said they would produce it under

7          confidentiality.  They said they would

8          produce it under confidentiality.  We did not

9          agree to that condition.  We had to take the

10         deposition.  And in order to take the

11         deposition, we said, well, you can designate

12         whatever you want as confidential and we will

13         challenge it.  We are challenging it.

14              They keep referring to this SEC rule

15         which does not apply to anything in this

16         case.  They're talking about the SEC Fair

17         Disclosure Rule.  And that talks about when

18         an issuer discloses any material, nonpublic

19         information to any person described in

20         paragraph B of this section, etcetera.  And B

21         says, broker dealer, investment advisor,

22         investment company, holder of the issuers

23         securities.  So it's something that is

24         supposed to give you an advantage in insider

25         trading or something.  I'm not sure exactly

1         what it is.  We are not within any of the

2         categories of persons to whom disclosure of

3         material nonpublic information would trigger

4         any type of penalty.

5              In addition, I suppose somebody could

6         fish through all their public statements and

7         make up their own organizational chart.  And

8         finally, I believe in one case, which is

9         pending in New York City, they have disclosed

10        at least part of the organizational chart.

11        So, again, it's just not confidential.

12             THE COURT:  All right.  Request for

13        production number nineteen; financial

14        reports, statements to investors, lenders of

15        each defendant for the last three years.

16             MS. FAULKNER:  That would apply only as

17        to Funding at this point.  Midland Credit

18        Management has stipulated to the financial

19        limits of the FDCPA.

20             THE COURT:  Okay.

21             MS. FAULKNER:  Midland Funding refuses

22        to stipulate.  It has given us a variety of

23        different information as to what its

24        financial situation is.  And at the

25        deposition, I think, they just gave us some

1    kind of a handwritten, maybe, or a

2    spreadsheet summary, which did not tell us

3    what we need to know to establish what the

4    net worth is for the purpose of class

5    recovery.

6        THE COURT:  All right; why is it

7    relevant?

8        MS. FAULKNER:  Because in order to

9    determine what the class is entitled to, we

10   need to know that their net worth is -- what

11   one percent of their net worth is.  That's

12   the limits of the FDCPA recovery.

13       For instance, if their net worth is

14   $30,000 -- my math is no good -- the recovery

15   would be $30 or something like that.

16       THE COURT:  All right.

17       MR. LEGHORN:  I think the information is

18   somewhat premature because this is only as to

19   if and when a class is certified to go to

20   class damages.  But trying not to put the

21   cart before the horse, in trying to move this

22   ahead, yes, we've stipulated to Midland

23   Credit Management being at the maximum

24   damages.

25       Midland Funding, the problem with

1          Midland Funding -- this sort of looks into

2          the other motion where they're seeking a

3          further deposition of Glen Freter, who

4          testified on it.  We were served with a

5          30(b)(6) motion and we dealt with that.

6               One of the items of topic to be

7          discussed was, one, the interrelationships

8          between the company, which gave rise to that

9          corporate chart, and, two, as to the net

10         worth of each of the two defendants.

11              Midland Funding did not -- Midland

12         Funding does not, in its ordinary course of

13         business, have financial records that would

14         make net worth a readily ascertainable

15         number.  Their financials are encompassed

16         within consolidated financials of the Encore

17         Capital Group.

18              So, in order to prepare Mr. Freter for

19         his deposition, he had to go into the

20         computer information, pull out the

21         information he needed to make a calculation

22         if Midland Funding was a stand-alone company

23         what would its net worth be.  And it came out

24         to the number -- and I'm not saying it

25         because this record is not under

```
 1              confidentiality.  It came out to a number
 2              less than the statutory minimum -- statutory
 3              maximum.  And, he, for the years that they
 4              requested for the two entities, Mr. Freter
 5              provided the net worth of Midland Credit and
 6              Midland Funding for each of the years.  It
 7              was just a simple page, that he typed so,
 8              when he testified he could give the
 9              information.  That is what they've talked
10              about.
11                   The underlying information, it's not
12              readily kept.  It basically is you needed
13              someone like the controller and his staff to
14              go into the computer, pull out what they
15              need, because they don't maintain this
16              information; it's not readily available; it's
17              unduly burdensome now to try to -- I don't
18              even know what it would encompass in terms of
19              trying to produce this in hard form.  But for
20              this purpose, I certainly say we've given
21              them -- we've said that Midland Credit, who
22              is the one who issued the letters, at the
23              heart of this case, we've said the maximum
24              damages is what is in play for them.
25                   With this company and even though it's
```

```
 1            not the maximum, it's still a substantial
 2            number.  I think the request goes too far.
 3            They've gotten the information that is
 4            appropriate at this point.  And if and when
 5            we get to class certification, if there's any
 6            issue remaining about this, that would be the
 7            more appropriate time.
 8                 THE COURT:  Well, there is no
 9            burdensomeness objection.  The objection, the
10            two objections that are advanced are, one,
11            that it's proprietary, and, two, that it's
12            overbroad and vague.
13                 MR. LEGHORN:  And in overbroad, when I
14            went to their offices in California and spent
15            time working through them, the overbroadness
16            revealed that it would be incredibly
17            burdensome.
18                 THE COURT:  Counsel, you have to make a
19            showing.  You can't just say, you know, this
20            is too hard.
21                 MR. LEGHORN:  It's not that it's too
22            hard.  It's documents that don't exist.  What
23            they're asking for would --
24                 THE COURT:  Then that's the answer to
25            the request.  That's not the basis of an
```

```
 1              objection.  That's the answer to the request.
 2              The answer to the request is there are no
 3              such documents.
 4                   MR. LEGHORN:  Right.  The only thing
 5              that exists, your Honor, is the controller
 6              went into the computer records and prepared a
 7              spreadsheet to make the determinations, and
 8              gave the piece of paper with the numbers for
 9              each of the years from the two entities.  And
10              that is it.  Other than that, the documents
11              do not exist.  They're not maintained for
12              Midland Funding.  We were trying to go above
13              and beyond.  And to go above and beyond
14              further would be burdensome.
15                   THE COURT:  All right; request for
16              production number twenty; income tax returns
17              for each defendant for the last three years.
18                   MS. FAULKNER:  Again, this would relate
19              only to Midland Funding because we have the
20              stipulation as to the net worth of Midland
21              Credit Management.
22                   MR. LEGHORN:  I believe the testimony of
23              the controller was that income tax returns
24              are not filed for Midland Funding.
25                   THE COURT:  So that might -- again, that
```

1          doesn't seem to be an objection, that seems

2          to be a response.

3                    MR. LEGHORN:  I jumped to the end, your

4          Honor.

5                    The tax records have nothing to do

6          with -- if income tax returns existed for

7          Midland Funding, that would do nothing to

8          establish net worth.  There'd be so many

9          other documents.  So, these are totally

10         irrelevant to even the request for which

11         they're being propounded.  So that's the

12         first objection.

13                   THE COURT:  An income tax return would

14         not likely lead to information about the net

15         worth of the defendant; is that what you're

16         saying?

17                   MR. LEGHORN:  Yes, your Honor.

18                   THE COURT:  All right.

19                   MS. FAULKNER:  Evidently there are some

20         documents which will show us the net worth,

21         because the controller was able to go in and

22         get information that would show us the net

23         worth.

24                   Midland Funding, if this is like the

25         rest of the system, has to show its net worth

```
 1              if it's going to buy something from somebody.
 2              There's some due diligence, when you look at
 3              each other's financials.
 4                   I find it difficult to believe that
 5              there are not financials out there that they
 6              have given to somebody from which we can
 7              examine them about their net worth.  And I
 8              also find it difficult to believe that they
 9              won't just stipulate to the figure.
10                   THE COURT:  Request for production
11              number six; records of communications
12              regarding the plaintiff's account.
13                   Counsel seem confused.
14                   MS. FAULKNER:  No, it was at the end.
15              It concerns the privilege log.
16                   MR. LEGHORN:  Oh, I'm sorry.
17                   MS. FAULKNER:  Excuse me, your Honor.
18                   THE COURT:  All right.
19                   MS. FAULKNER:  The records of the
20              communication with any person regarding any
21              matter involving account of this particular
22              plaintiff.  And they object to the extent
23              that seeks documents protected by the
24              work-product or attorney-client privilege,
25              but they haven't specified what that is.
```

```
 1            They object to confidentiality, propriety,

 2       trade secrets.  They haven't specified that.

 3       And then they attach a privilege log which

 4       just doesn't comply with the requirements of

 5       the privilege log.  And I can't tell, even

 6       what they say because they're blank pages.

 7       They don't even have headings or footers or

 8       anything.  The whole document is just blank.

 9            What the privilege principals require

10       is that you redact only the things that you

11       claim are confidential.  They don't identify

12       the people who are the communicants.  Only

13       one of whom I know is a lawyer, the rest

14       don't seem to be lawyers.

15            So, I think whatever is there for the

16       privilege has not been adequately sustained.

17            There are other lawyers that are

18       identified here.  Adam Olshant is a lawyer,

19       Rita Malconian is a lawyer, and Janine Dumont

20       is a lawyer.  They've identified Joanne

21       Wobble as a lawyer, but I can't find her as a

22       lawyer any place, so, I doubt she is.

23            THE COURT:  All right.  Let me hear from

24       the defendant.  So the argument is, from the

25       plaintiff, that the privilege log is
```

```
 1              inadequate because there have been -- the

 2              documents should have been narrowly redacted?

 3                   MS. FAULKNER:  Yes.

 4                   THE COURT:  Not all the people involved

 5              in the communications are lawyers?

 6                   MS. FAULKNER:  Right.

 7                   THE COURT:  Some are just between

 8              individuals who are not counsel, and what

 9              else?

10                   MS. FAULKNER:  That I can't even tell

11              what they are -- oh, well, I guess that's the

12              redacted.

13                   MR. LEGHORN:  I believe the format is

14              appropriate:  To, from, nature of the

15              document, and the offering recipients.

16                    It is my firm belief that all of the

17              individuals that are identified are, in fact,

18              lawyers.  I am more than happy to submit

19              these documents in camera for the Court's

20              inspection, if you'd like to review them.

21                   THE COURT:  Is there anything else

22              submitted to support the privilege, any

23              affidavits or anything of that nature?

24                   MR. LEGHORN:  No, your Honor.

25                   THE COURT:  So the only thing to support
```

```
1           the privilege is this privilege log?  I want

2           to make sure I am focused on the correct

3           documents.

4                I have a privilege log.  It has four

5           entries on the first page, two entries on the

6           second page, and that's it, right?

7                MR. LEGHORN:  That's it, your Honor,

8           correct.

9                THE COURT:  And there's nothing else?

10               MR. LEGHORN:  That's it, your Honor.

11               THE COURT:  What about this argument

12          about redactions?  How am I to tell,

13          secondly, whether these people are lawyers?

14               MR. LEGHORN:  Well, I think Ms. Faulkner

15          has identified all but one of the entries of

16          having people that she personally knows are

17          lawyers.  As to the final one that she

18          mention, I'm more than happy to identify and

19          get the supporting information for her that

20          this is a lawyer as well.

21               THE COURT:  Well, of course, I have to

22          make that determination based on the record

23          before me.

24               MR. LEGHORN:  Right.  All the

25          individuals that counsel has indicated are
```

```
 1              lawyers, I too know from dealing with them

 2              that they are all lawyers.  The final name

 3              that Ms. Faulkner mentioned is an individual

 4              that was represented to me to be a lawyer as

 5              well.

 6                   THE COURT:  Which is?

 7                   MS. FAULKNER:  Wobble.

 8                   THE COURT:  All right.  So the plaintiff

 9              questions whether the person listed as Joanne

10              Wobble, Esq., is in fact a lawyer.

11                   MR. LEGHORN:  And I'm happy to -- this

12              has not been raised previously, but that was

13              the basis of the objection through our

14              assertion of privilege.  I'm more than happy

15              to get the supporting documentation and

16              forward it.

17                   MS. FAULKNER:  It actually was raised in

18              my opening brief on November 18th.  And I did

19              analyze the documents, which appear to be

20              collection records, which do not appear to

21              ask for or give legal advice.

22                   MR. LEGHORN:  In collection records,

23              your Honor, is the electronic summary that is

24              kept of communications back and forth and by

25              which the lawyers do communicate with the
```

```
 1            client, the collection entity.  So even

 2            though it may be a screen shot contained

 3            within a collection record, it is no

 4            different than a letter or a verbal

 5            communication between the lawyer and a

 6            client.  It's just an electronic format that

 7            gets batched in sequentially in chronological

 8            order.

 9                 THE COURT:  So how many documents are

10            there in total that are withheld on the

11            grounds of privileges?

12                 MR. LEGHORN:  I think it's basically

13            six.

14                 THE COURT:  Six pages?

15                 MR. LEGHORN:  Six documents, your Honor.

16                 MS. FAULKNER:  It looks like Bates 19,

17            18 through 33.  They may only be six

18            documents, but those are the pages that I got

19            that were blank.

20                 THE COURT:  And then there were three

21            entries here that say "Midland 001."  There's

22            one Bates number, the three entries on the

23            privilege log.  What should I make of that?

24                 MS. FAULKNER:  Yes, you're right, your

25            Honor.  That's a blank page.  It just says
```

1       "Midland 001" at the bottom of it.  That's

2       the single page.

3            MR. LEGHORN:  And those are probably

4       three separate entries to distinguish there

5       was different individuals and different

6       times; so, to give more information.

7            MS. FAULKNER:  It must be, perhaps, an

8       email chain.  I'm not sure.  I can't tell.  I

9       can't tell even whether it was to and from

10      these people.

11           THE COURT:  So, how is the Court to make

12      a determination as to whether these documents

13      are privileged?  The burden is on the person

14      claiming the privilege to show it's

15      privileged.

16           MR. LEGHORN:  And we've set forth the

17      initial prima facie showing in terms of

18      communication with the lawyer and the client.

19      And I renew my offer.  I will gladly submit

20      these for in camera inspection to demonstrate

21      that they are communications between the

22      lawyer and a client.

23           THE COURT:  Let's go on to the second

24      motion to compel, which is at docket number

25      thirty.  Are all of these still in dispute?

1        Have any been resolved?

2             MS. FAULKNER:  None of them have been

3        resolved.

4             THE COURT:  All right.  Interrogatory

5        number seventeen.

6             MS. FAULKNER:  All we are asking for is

7        the name and address of all the -- of certain

8        individuals at Midland Funding.  Essentially,

9        they say Midland Funding didn't do anything,

10       but Midland Funding had to do something.

11       They had to be indirectly collecting.  They

12       had to have somebody doing something.  We

13       want to see who those people were.

14            THE COURT:  So you want the names of the

15       officers, directors, and all shareholders?

16            MS. FAULKNER:  No.

17            THE COURT:  All right.

18            MS. FAULKNER:  I think the -- oh, I do,

19       yes.  Each officer, director, and shareholder

20       of Midland Funding.  I think there's probably

21       one shareholder of Midland Funding.

22            THE COURT:  And why is that relevant?

23            MS. FAULKNER:  Because they say that

24       Midland hasn't done anything.

25            THE COURT:  But what's that relevant to,

```
 1              what claim?
 2                   MS. FAULKNER:  That they violated the
 3              collection laws.  Somebody had to do
 4              something at Midland.  Midland claims it
 5              bought the debt.  Somebody had to buy it.
 6              Midland claims it authorized Credit
 7              Management to collect.  There had to be
 8              somebody with some position that did
 9              something.  This is not a blank shell.
10                   THE COURT:  All right.
11                   MR. LEGHORN:  It isn't relevant, your
12              Honor.  And Midland Funding -- and I happen
13              to have argued this before the Second Circuit
14              last Tuesday.  Midland Funding is a passive
15              debt purchaser.  It has no employees.  This
16              is what was testified to, in this case as
17              well, by Mr. Freter and Mr. Frary.
18                   The servicing agreement that we
19              previously discussed is the debts are
20              purchased and a servicing agreement, in this
21              particular instance, was entered into on
22              behalf of Midland Funding, by its officers to
23              have all activity, collection activity
24              carried out by Midland Credit Management.
25                   Contrary to plaintiff's assertion,
```

1          Midland Funding doesn't have to do anything,

2          other than being a passive investment

3          vehicle, that they purchase it and others,

4          for a fee, process or attempt to collect a

5          debt.

6                  This information is totally irrelevant.

7          Plaintiffs have already probed this with the

8          two witnesses that were given.  That was one

9          of the items on a Rule 30(b)(6) deposition

10         notice.  We gave that information.  This is

11         totally irrelevant.

12                 In connection with that deposition,

13         they also identify who was the 100 percent

14         owner of the company.  That was identified in

15         the deposition under the confidentiality.  If

16         they're just looking for the names of the

17         officers of the two entities, I can provide

18         that, your Honor, as a combination, but I

19         don't see it as relevant.

20                 THE COURT:  I think that's what the

21         plaintiff just asked for:  The names of the

22         officers and directors and the shareholder,

23         assuming there's one shareholder.

24                 MS. FAULKNER:  That's true.

25                 MR. LEGHORN:  But I am not agreeing to

1          provide their home addresses, your Honor.

2              THE COURT:  Do you need their home

3          addresses?

4              MS. FAULKNER:  If we can serve a

5          subpoena on them at their office addresses if

6          they need to.  That's fine.

7              THE COURT:  All right; interrogatory

8          number eighteen.

9              MS. FAULKNER:  That's, essentially, the

10         same as seventeen, your Honor, except it is

11         related to the specific purchase and sale

12         agreement that was executed in this case.

13             THE COURT:  You want to know who

14         executed the purchase and sale agreement?

15             MS. FAULKNER:  Right.

16             THE COURT:  All right.  What will that

17         lead you to?  Why is that relevant?

18             MS. FAULKNER:  They keep saying Midland

19         Funding doesn't do anything.  Somebody must

20         have done something.  I want to know who has

21         authority to do something on behalf of

22         Midland Funding.

23             MR. LEGHORN:  That would be a valid

24         argument if these letters were coming from

25         Midland Funding.  Each of the letters clearly

1          stated they're from Midland Credit Management

2          and that Midland Funding was the owner of the

3          debt.

4                It is not necessarily logical that one

5          has to assume Midland Funding had to do

6          anything other than purchase this as an

7          investment and let Midland Credit collect

8          upon it.

9                Who signed this on behalf of Midland

10         Funding or Midland Credit or anyone is

11         totally irrelevant to the claim of whether,

12         between the three letters, the plaintiff was

13         advised that the number could go up.

14              THE COURT:  What would it show you to

15         help you prove that claim?

16              MS. FAULKNER:  It would give us somebody

17         to depose, to find out what -- did somebody

18         authorize the letters; did somebody authorize

19         the interest.  They can't have done nothing.

20              THE COURT:  Well, has the evidence

21         revealed that it was the other defendant who

22         did the actual collecting?  That's what I'm

23         lead to believe.

24              MS. FAULKNER:  It's clear that Credit

25         Management did the actual collecting.

```
 1            THE COURT:  Yes.

 2            MS. FAULKNER:  But that isn't the end of

 3       the inquiry because anyone who indirectly

 4       collects is also a debt collector and is also

 5       liable.

 6            So Midland Funding put all this into

 7       play and authorized what Midland Credit did;

 8       they are just as liable.

 9            THE COURT:  All right; I understand that

10       argument.

11            MR. LEGHORN:  And we had a 30(b)(6)

12       deposition on both defendants.  The

13       plaintiffs got to chose the topics that they

14       wanted to explore with the defendants.

15            Plaintiff's counsel is saying we have

16       someone to depose.  So, they put the burden

17       on me to put forward the people and I did and

18       I responded.  And each of the people were

19       fully prepared and did testify to each of the

20       agreed upon topics.

21            We have acknowledged in the papers and

22       in depositions that Midland Funding was the

23       purchaser of the debt and that it was given

24       over to Midland Credit to service.  That's

25       all that's needed for plaintiff to establish
```

1        that Midland Credit and Midland Funding are

2        considered debt collectors under the statute.

3        I don't see where any further involvement or

4        probing of information is going to get us any

5        further at all in this.

6             THE COURT:  So what you're saying is

7        they already know everything that they need

8        to know, and knowing more won't advance the

9        ball in any way for the plaintiff?

10            MR. LEGHORN:  Correct, your Honor.

11            MS. FAULKNER:  Again, once again we

12       don't have to sit here and believe everything

13       they say.  We are entitled to some kind of

14       documentation, some kind of back up.

15            MR. LEGHORN:  But you need a seed from

16       which to grow the claim.  And plaintiffs have

17       not been able to, with everything that we've

18       put forward, to show that there is anything

19       being put forward that is anything other than

20       fully totally candid and supportable.  This

21       is not a -- the Federal Rules is not an open

22       invitation to cast a wide net.  We've

23       responded fully to the requests, they had the

24       opportunity.  There should not be successive

25       waves of, like, well that didn't get me where

```
1          I wanted to, I should go forward further,

2     unless the first wave showed a basis on which

3     to explain to the Court and to us why it

4     would be fruitful.

5          THE COURT:  Okay.  I think that brings

6     us to request number twenty-nine and thirty,

7     minutes of meetings at which Midland Funding

8     determined to engage Midland Credit as a

9     servicer, and the minutes when Midland

10    decided to enter into a certain transaction

11    that occurred on June 15th.

12         MS. FAULKNER:  Again, your Honor, this

13    is just to show that there is somebody doing

14    something at Midland Funding.  If there is

15    somebody there doing something, then they are

16    indirectly collecting, and we need that

17    documentation.

18         THE COURT:  And what is this June 15th

19    transaction?

20         MS. FAULKNER:  That's the supposed

21    transaction that they purchased the

22    plaintiff's account.

23         THE COURT:  Okay.

24         MR. LEGHORN:  Your Honor, I'll stand on

25    the prior arguments on that point.
```

```
 1              MS. FAULKNER:  I can also mention, your

 2         Honor, that if this case does not go off as a

 3         class transaction, some of this discovery is

 4         for our back up claims that we will also

 5         raise, if it does not go off as a class

 6         action.  So it's just general background,

 7         discovery that we take from every collection

 8         agency.

 9              MR. LEGHORN:  I would only say to that,

10         your Honor, I thought the time to amend the

11         complaint had long passed.  And I was

12         responding to the claims at hand and

13         certainly not claims that may be circulating

14         out there that I can't guess at.

15              THE COURT:  Okay.  I think we've arrived

16         at the plaintiff's motion to compel at docket

17         number fifty-five, which is about the

18         financial records underlying the deposition

19         testimony of Glen Freter.

20              I'll hear you on that.

21              MS. FAULKNER:  We are still trying to

22         get at the net worth of Funding.  So this

23         relates only to the Funding aspect of the

24         depositions.

25              THE COURT:  Defendant seems to be saying
```

```
 1              two things.  One, that you didn't ask for it

 2              when you took the deposition.  There was no

 3              subpoena for documents that accompanied the

 4              notice of deposition.  And the other argument

 5              seems to be you really didn't do a thorough

 6              job at the deposition and now you're kind of

 7              back filling or trying to back fill.

 8                  MS. FAULKNER:  All we're trying to do is

 9              get at the documents that they had backing up

10              the documents that they brought.

11                  We, of course, had filed our motions to

12              compel way back in November and we had hoped

13              that we would have all this information

14              before the discovery cut off, and we came to

15              the discovery cut off and had to take the

16              depositions.

17                  They had agreed to give us some

18              documents, which they did not produce at the

19              deposition.  And they, essentially,

20              frustrated our ability to do the net worth

21              investigation.

22                  THE COURT:  So am I to understand that

23              there was some sort of summary document at

24              the deposition relied upon by the witness?

25                  MS. FAULKNER:  Yes.
```

Falzarano Court Reporters

1          THE COURT:  And the witness referred to

2     this summary document in his testimony; is

3     that it?

4          MS. FAULKNER:  Yes, and he said the

5     background materials, the back up material is

6     back on his desk at the office, and refused

7     to go get it.

8          THE COURT:  And you saw the summary

9     document; is that it?

10          MS. FAULKNER:  Yes.

11          THE COURT:  But not whatever this

12     information or the documents on which the

13     summary document was based?

14          MS. FAULKNER:  Right.  And this all goes

15     back to what we've argued before about our

16     need to establish the net worth of Funding

17     only.

18          THE COURT:  All right.  I understand.

19          MR. LEGHORN:  The summary document was

20     given that he was referring to.  And I was

21     present, and the only document was agreed to

22     be given was that sheet.  So, there was no

23     agreement to provide further documents that I

24     did not live up to.  I was the one that

25     traveled out to California and handled the

1    deposition.

2        The summary document, the other

3    document counsel refers to is that all the

4    witness was saying was that to make the

5    summary document, he and his staff had to go

6    into the computer information and prepare an

7    Excel spreadsheet figuring out the

8    computations to give the numbers.  I think it

9    was for three years for each of the two

10   entities.  So, there were six numbers for the

11   two entities with three different years and

12   the corresponding numbers.  All the Excel

13   spreadsheet would do would have those

14   numbers, those dates for those entities on a

15   spreadsheet rather than a typed piece of

16   paper.

17       The deposition was conducted in

18   downtown San Diego and the witness's office

19   was on the other end of the county.  It

20   wasn't a matter of going to another room to

21   get the Excel spreadsheet.  It was not asked

22   for, previous to the deposition, and it is

23   not going to reveal any further information

24   then that they already have.

25       That is the totality of what this

1     motion is really compelling.  And Mr. Freter,

2     and that I was the one that worked with him

3     on several occasions prior to the deposition

4     and for a full day before the deposition to

5     make sure he was able to answer any relevant

6     pertinent question on this issue, he was

7     capable of answering it.  It was a very

8     cursory deposition.  And reading through the

9     transcript that's been presented it was more

10    arguments about why I can't go forward, as

11    opposed to just asking the questions, your

12    Honor.

13          THE COURT:  So, as a general rule, do

14    you think that when a witness relies upon a

15    document in his or her testimony, adversary

16    counsel is entitled to see the document on

17    which the witness relied?

18          MR. LEGHORN:  And that's why we gave it

19    to them.  The witness came with one document

20    and we gave it to them.

21          Absolutely, your Honor.  If you're

22    going to rely upon a document rather than

23    committing it to memory, because we wanted to

24    fulfill our obligation for the 30(b)(6) that

25    the witness has to carry out the necessary

1          investigation to have the answer, even if

2          it's not his personal knowledge.  He did

3          that.  I made sure he did that.  And to make

4          sure the answers were correct, it was put on

5          a piece of paper, typed, and we provided it

6          at the deposition.  That's it.

7              The only thing that would be found from

8          the Excel spreadsheet is them in the computer

9          making the calculations for the six numbers

10         that were on the page that were turned over.

11         It'd be the same except on a spreadsheet.

12             THE COURT:  So why is the -- if it's the

13         same document, why is it such a big issue?

14             MR. LEGHORN:  Because they're asking for

15         it as part of the deposition.  The document

16         is not what concerns me so much, your Honor.

17         I will turn it over under the same

18         confidentiality provisions that we turned

19         over that one sheet.  But what I'm really

20         opposing is a request for further deposition.

21         If all they want is that Excel spreadsheet,

22         I'll produce that.  It'll just show the same

23         numbers, your Honor.

24             THE COURT:  All right.

25             MS. FAULKNER:  May I show your Honor

 1              this confidential document that he's

 2          referring to?

 3              THE COURT:  Sure.  Do you have any

 4          objections?

 5              MR. LEGHORN:  That's not the document --

 6          oh, that one, yes.

 7              THE COURT:  You don't have any objection

 8          to my looking at this?

 9              MR. LEGHORN:  If that is the one that

10          shows the dates and the two --

11              THE COURT:  Do you want to make sure

12          before I look at it?

13              MR. LEGHORN:  I'm sure it's the same

14          document, but I'll take a look at it.

15              Thank you.  My memory is wrong; it's

16          four years, not three years.

17              THE COURT:  Okay.  And the witness

18          testified to what?  I see that this exhibit,

19          just for the record, it lists four years in

20          the left column, 2005, 2006, 2007, 2008.  And

21          then as to each year, there's a number, which

22          I assume are dollar amounts.

23              Counsel are nodding.

24              MR. LEGHORN:  Yes, your Honor.

25              THE COURT:  One entry for Midland Credit

```
 1                Management Net Equity; the next column

 2                Midland Funding LLC Net Equity.  And there

 3                are numbers listed in each column for each of

 4                the four years.  And the witness testified as

 5                to what regarding this document?

 6                     MS. FAULKNER:  I wasn't there, your

 7                Honor, and I haven't read the deposition

 8                recently, but he did say he had the back up

 9                documents elsewhere on his desk.

10                     I've seen Mr. Francis take financial

11                depositions and he's very good at reading and

12                probing financial statements.  But when you

13                get just a blanket figure presented to you,

14                this is it, you can hardly do any probing.

15                     THE COURT:  So how much further

16                deposition testimony would be required?

17                     MS. FAULKNER:  It depends on what we get

18                by way of financials.  Since one of the

19                things they were going to give us at the

20                deposition was the SEC filing showing the net

21                worth of the whole company, which would have

22                enabled Mr. Francis to do something anyway,

23                and that was not given, it's probably -- I

24                would think we could arrange for a telephone

25                deposition once we got the financial
```

```
 1              information that we needed to probe the

 2              accuracy of the resulting figures.

 3                   MR. LEGHORN:  The SEC filings was not

 4              something that I was going to give them.  It

 5              was we were trying to work out a stipulation

 6              as to the net worth of each of these entities

 7              in advance.  And one of the provisions that

 8              Mr. Francis had put into the proposed

 9              stipulation was that they could rely upon the

10              Encore SEC filings, which are available

11              online.  We could call them up on this screen

12              here now.

13                   So there was no agreement that I was

14              going to print them out and have them

15              available.  It was just a part of that

16              proposed stipulation, which didn't come to

17              pass because Mr. Freter, doing the

18              calculations, found out that Midland

19              Funding's number was not a number that would

20              trigger the maximum damages.  So that

21              discussions -- plaintiffs were not willing to

22              stipulate to any number less than the full

23              number; we weren't going to stipulate to a

24              true number.

25                   All this goes to Midland Funding.
```

1          Counsel has already said it's not an issue as

2     to Midland Credit Management.  I've already

3     stated that Midland Funding is part of the

4     consolidated financials of Encore Capital.

5          Other than providing that Excel

6     spreadsheet, which is just going to have the

7     same eight numbers as this, there's nothing

8     further for me to give.

9          They could have pulled up the Encore

10    Capital SEC filings at any point in this

11    litigation.  They could have brought them

12    with them.  In fact, Mr. Francis forgot to

13    bring most of the documents with him to the

14    deposition, which caused some of the fumbling

15    along.

16          I was there for the deposition.  I

17    don't see what any deposition, whether it's

18    by phone or in person, would carry out at

19    this point, your Honor.  But I am more than

20    happy to provide that Excel spreadsheet under

21    a confidentiality agreement as well.

22          THE COURT:  I think we've reached the

23    end.  All right.  It's been a long afternoon,

24    I think, for everyone.  I'm sorry that the

25    day was punctuated for you by the criminal

```
 1              matters, but I know you understand that I
 2              just had to take those.
 3                   MR. LEGHORN:  We fully understand and
 4              our problems pale in comparison to those
 5              individuals.
 6                   Your Honor, if we can do one other
 7              thing.  I think one of the things that was on
 8              was for a pre-motion conference and a motion
 9              for summary judgment.
10                   THE COURT:  It is.
11                   MR. LEGHORN:  I was hopeful that we
12              could set up a briefing schedule for that.
13                   THE COURT:  I wonder if we could do that
14              by telephone?
15                   MR. LEGHORN:  Yes, we can, your Honor.
16                   THE COURT:  All right.  Why don't we
17              plan on that.  I'm going to take the papers
18              and let's get through this step first.  All
19              right.
20                   MR. LEGHORN:  Okay.  That will be fine,
21              your Honor.  Thank you very much.
22                   THE COURT:  Thank you all.
23                   MR. LEGHORN:  Thank you for your time.
24
25                   (Concluded:  4:08 p.m.)
```

84

1                       CERTIFICATE

2

3          I hereby certify that the foregoing 83

4      pages are a complete and accurate

5      computer-aided transcription of my original

6      stenotype notes taken of the proceedings, which

7      were held in re:  KENNETH JONES, ET AL VS.

8      MIDLAND FUNDING, LLC, ET AL, held before the

9      Honorable Donna F. Martinez, USDC Magistrate

10     Judge, U.S. District, 450 Main Street,

11     Hartford, Connecticut on May 28, 2009.

12

13

14

15                 /s/Irma I. Sanchez

16                 IRMA I. SANCHEZ
                   Court Reporter
17

18

19

20

21

22

23

24

25